```
FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: May 11 2023

KEVIN P. WEIMER, Clerk

By: s/Kari Butler
                    Deputy Clerk
```

(USAO GAN 6/10)  Search Warrant

# United States District Court

NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

SUBJECT DEVICES A, B and C Seized by the Drug Enforcement Administration on May 2, 2023

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**
Case number: 4:23-MC-40

I, James C. Williams, being duly sworn depose and say:

I am a Special Agent of the DEA and have reason to believe that in the property described as:

Subject Devices A, B and C as further described in Attachment A

in the Northern District of Georgia there is now concealed certain information, namely,

see attachment B,

which constitutes evidence of a crime, concerning violations of Title 21, United States Code, Section(s) 841 and 846.  The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

*Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1*

*James C. Williams*
Signature of Affiant

James C. Williams

May 11, 2023                                    Rome, Georgia
Date                                            City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

*Walter E. Johnson*
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AUSA Sandra Strippoli, 404-581-6304

# AFFIDAVIT FOR SEARCH WARRANT OF ELECTRONIC DEVICES

1. I, James C. Williams, a Special Agent with the Drug Enforcement Administration (DEA), depose and state under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am therefore an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2. I have been a Special Agent with the DEA since April 2009. I am currently assigned to the Atlanta Field Division, Rome Post of Duty (POD). Prior to my employment as a Special Agent with the DEA, I was employed by the U.S. Secret Service as a Special Agent for approximately two years and before that as a DEA Diversion Investigator for approximately two years.

3. Upon joining the DEA, I received 4 months of training in narcotics investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

4. During my assignment with the DEA, I have participated in numerous search and seizure warrants pertaining to the seizure of contraband and evidence, including warrants resulting in the seizure of illegal drugs, drug paraphernalia, drug records, and proceeds of drug trafficking. I have debriefed numerous defendants, informants, and witnesses, who possessed personal knowledge regarding drug trafficking organizations. I also have become familiar with and utilized investigative techniques such as, without limitation, electronic and physical surveillance, general questioning of witnesses, use of search warrants, use of informants, use of grand jury subpoenas, use of pen registers, and use of undercover agents.

5. Based on my training and experience in the investigation of drug traffickers, and based upon interviews I have conducted with defendants, informants, and other witnesses and participants in drug trafficking activity, I am familiar with the ways in which drug traffickers conduct their business. My familiarity includes: the various means and methods by which drug traffickers import and distribute drugs; their use of cellular telephones to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions. I also am familiar with the ways that drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without

limitation, the use of carriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, and the use of off-shore accounts.

6. I also know from my training and experience that individuals smuggle and/or transport illegal controlled substances using vehicles. These individuals evade law enforcement by conducting counter-surveillance maneuvers known as surveillance detection runs, or more commonly known as "heat runs." These maneuvers commonly consist of constant route changes, lane changes, U-turns, and making frequent stops at commercial retail stores among other maneuvers designed to make mobile vehicle surveillance more difficult and dangerous to law enforcement personnel. Often, drug traffickers will reside in one location and store, or "stash," drug supplies in another. While traveling to stash locations, traffickers will often use privately owned vehicles. While traveling to and from stash locations, traffickers will often conduct the maneuvers described above and will take illogical routes from one location to another in an attempt to evade or confuse law enforcement surveillance efforts. In addition, I have consulted extensively with other experienced agents regarding drug trafficking activities. As a result, the knowledge that I have obtained during my law enforcement career has been further informed by other law enforcement agents with experience conducting drug investigations.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched (**Subject Device A** and **Subject Device B**) were seized during the arrest of Edgar RUBIO on May 2, 2023 on the on-ramp to Interstate 75 south at mile marker 341, Tunnel Hill, Georgia. **Subject Device C** also was seized on May 2, at RUBIO's residence, 1685 Farley Drive, Tunnel Hill Georgia, upon the execution of a federal search warrant. RUBIO was arrested on State of Georgia charges of Trafficking Methamphetamine, Possession of Methamphetamine, and Possession of Methamphetamine with Intent to Distribute.

8. The property to be searched is described further in Attachment A, which is incorporated here:

   a. **SUBJECT DEVICE A:** One black TCL smart phone (unknown phone number) seized on May 2, 2023 and currently located in the DEA Rome non-drug evidence locker.

   b. **SUBJECT DEVICE B**: One blue Motorola smart phone with a black protective case (unknown phone number) seized on May 2, 2023 and currently located in the DEA Rome non-drug evidence locker.

   c. **SUBJECT DEVICE C:** One space gray Apple iPhone (unknown phone number) seized on May 2, 2023, currently located in the DEA Rome non-drug evidence locker.

9.  Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that presently concealed in **SUBJECT DEVICE A**, **SUBJECT DEVICE B** and **SUBJECT DEVICE C** is information and data described in Attachment B, incorporated herein by reference, which may constitute evidence of a crime, contraband, fruits of crimes, or other items illegally possessed, or property designed for use, intended for use, or used in committing violations of Title 21, United States Code, Sections 841, 843(b), and 846, as well as 18 U.S.C. 924(c).

10. The applied-for warrant would authorize the forensic examination of **SUBJECT DEVICE A**, **SUBJECT DEVICE B,** and **SUBJECT DEVICE C** for the purpose of identifying electronically-stored information and data particularly described in Attachment B. In my training and experience, I know that **SUBJECT DEVICE A, SUBJECT DEVICE B, and SUBJECT DEVICE C** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into law enforcement possession.

## SOURCES OF INFORMATION CONTAINED HEREIN

13. I make this affidavit based upon personal knowledge derived from my participation in this investigation, information I have learned from discussions with Special Agents and Task Force Officers of DEA, Calhoun Drug Task Force, and other law enforcement officers, and review of written reports.

14. I have endeavored to make clear which facts stated in this Affidavit are based upon my own personal observations and which are not. Unless otherwise noted, factual statements not based upon my personal observations are based upon information received from one or more other law enforcement officers who may have either direct or hearsay knowledge of the factual statement, such knowledge having been conveyed to me either personally or through a report that I have reviewed. Wherever in this Affidavit I state my belief, such belief is based upon my training and experience and upon the information obtained through this investigation.

15. Because I am submitting this Affidavit for the limited purpose of demonstrating probable cause for the requested search warrant, I have not included each and every fact known about this investigation.

## PROBABLE CAUSE

16.     In early March 2023, agents with the DEA Rome POD North Georgia HIDTA Task Force and Whitfield County Sheriff's Office (WCSO), began investigating the drug trafficking activities of Edgar RUBIO. The investigation showed RUBIO distributed large quantities of methamphetamine to various customers in northern Georgia and elsewhere.

17.     On April 4, 2023, TFO Wayne Lloyd, acting in an undercover capacity, and RUBIO, using 762-344-8191, exchanged text messages.  TFO Lloyd sent, "Hey this Wayne.  We still good for today." Shortly thereafter, RUBIO responded, "Yeah man. I can meet bout 7 or so."  TFO Lloyd then responded, "Ok. Anyway we can do it earlier. I go to work at 6.  How bout 3." RUBIO responded, "I have appointments.  I can go now. ???" TFO Lloyd replied back stating, "Tame me a minute to get there.  Bout 1:30? Same place as last??"[1]

18.     At approximately 1:03 p.m., TFO Lloyd sent RUBIO a text message stating, "Bout 15 away" to which RUBIO replied "Where."  TFO Lloyd stated "From last spot, Mex Restaurant" referring to the El Sueno Mexican Restaurant at 4109 S.

---

[1] A Confidential Source driven to the meet location by TFO Lloyd also purchased a quantity of methamphetamine from RUBIO on or about March 9, 2023.  The substance purchased has been tested by a chemist and confirmed to be methamphetamine,

7

Dixie Highway, Dalton, GA.  RUBIO, then responded, "Send me an address." TFO Lloyd then sent, "4109 south Dixie hwy."  RUBIO replied, "B there in like 25."

19. At approximately 1:14 p.m., TFO Lloyd arrived at the restaurant and parked in the last parking spot next to S. Dixie Highway facing the entrance to the parking lot.  At 1:31 p.m., TFO Lloyd observed the white Nissan Frontier truck, known to be driven by Rubio, pull onto the lot next to TFO Lloyd's undercover vehicle.  TFO Lloyd exited his vehicle and approached the driver's side window of RUBIO's truck which was already rolled down.  TFO Lloyd asked RUBIO if he wanted him to get in the truck with RUBIO and RUBIO advised that he did.  TFO Lloyd got in the passenger seat of RUBIO's vehicle where he and RUBIO greeted each other.  RUBIO sold TFO Lloyd 6 ounces of methamphetamine for $1,100 official advanced funds before leaving. Agents followed RUBIO directly to his residence located at 799 N. Varnell Road, Tunnel Hill, Georgia.  The Mid-Atlantic Regional Laboratory confirmed the substance was methamphetamine.

20. On May 2, 2023, at approximately 8:00 a.m., agents established surveillance in the vicinity of RUBIO's residence in anticipation of luring RUBIO out to sell TFO Lloyd another 6 ounces of methamphetamine as well as 50 dosage units of fentanyl pills. At approximately 8:25 a.m., agents observed RUBIO driving out of his neighborhood. At approximately 8:27 a.m., GSP Trooper Donnie

Cochran conducted a traffic stop and arrested RUBIO pursuant to an arrest warrant for violations of the Georgia Controlled Substances Act issued in Whitfield County, Georgia. A subsequent inventory of his vehicle revealed 2 cellular telephones (**SUBJECT DEVICE A** and **SUBJECT DEVICE B)**, a black grocery bag stuffed between the two front seats containing approximately 6 ounces of methamphetamine along with 50 dosage units of fentanyl pills. Agents also retrieved a key to RUBIO's residence from his key ring. The suspected methamphetamine was positive in a field test, as was the suspected fentanyl.

21.   At 9:08 a.m., agents executed a federal search warrant at RUBIO's residence. Agents seized **SUBJECT DEVICE C**, approximately 1 kilogram of methamphetamine, approximately 60 fentanyl pills, and a .22 caliber Beretta handgun during the search.

22.   Based on my training, knowledge, and experience, I know drug traffickers often use multiple phones at a time to attempt to insulate themselves from law enforcement.  Drug traffickers also commonly use one phone to talk to their customers and will oftentimes have a separate phone they communicate with their source of supply.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless

telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.

Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, I know that **SUBJECT DEVICE A**, **SUBJECT DEVICE B** and **SUBJECT DEVICE C** have capabilities that allow them to serve as a wireless communication device, digital camera, portable media player, and GPS navigation device. In my training and

experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

> g. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

h. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

i. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

j. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      k. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **SUBJECT DEVICE A, SUBJECT DEVICE B** and **SUBJECT DEVICE C** to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is the following cellular telephones:

**SUBJECT DEVICE A:** One black TCL smart phone (unknown phone number) seized on May 2, 2023 and currently located in the DEA Rome non-drug evidence locker.

**SUBJECT DEVICE B**: One blue Motorola smart phone with a black protective case (unknown phone number) seized on May 2, 2023 and currently located in the DEA Rome non-drug evidence locker.

**SUBJECT DEVICE C**:  One space gray Apple iPhone (unknown phone number) seized on May 2, 2023, currently located in the DEA Rome non-drug evidence locker.

## ATTACHMENT B

1. All records and information on **SUBJECT DEVICE A**, **SUBJECT DEVICE B,** and **SUBJECT DEVICE C** (described in Attachment A) from January 1, 2023 to May 10, 2023 that relate to violations of 21 U.S.C. §§ 841, 843(b), and 846, as well as 18 U.S.C. 924(c), including, but not limited to:

   a. Contact information to include names, addresses, telephone numbers, email addresses, or other identifiers;

   b. Call log information, including missed, incoming, and outgoing calls and any information associated with those numbers;

   c. Photographs, video and audio files that show the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

   d. Text messages, email messages, chats, multimedia messages, messages through other installed applications or other electronic communications that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators;

   e. Any Global Positioning Satellite (GPS) entries, records of Internet Protocol Connections, and location entries to include cell tower and Wi-Fi entries;

   f. Internet or browser entries or history;

   g. System, data or configuration information contained within the device;

2

    h. Lists of customers and related identifying information;

    i. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    j. Information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    k. Information recording RUBIO's schedule or travel;

    l. Bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned **SUBJECT DEVICE A, SUBJECT DEVICE B** and **SUBJECT DEVICE C** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

For discovery and authentication purposes, DEA will maintain a forensic copy of searched subject devices.